**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARQUIS ADVANTAGE, INC., d/b/a AGERIGHT ADVANTAGE HEALTH PLAN,<br><br>                Plaintiff,<br><br>   v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services; and MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare and Medicaid Services,<br><br>                Defendants. | Civil Action Case No. 1:26-cv-2696 |

**COMPLAINT**

Plaintiff Marquis Advantage, Inc., d/b/a AgeRight Advantage Health Plan ("AgeRight"), brings this action for relief under the Administrative Procedure Act against the United States Department of Health and Human Services ("HHS"); the Centers for Medicare & Medicaid Services ("CMS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services; and Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare and Medicaid Services, (collectively, "Defendants"), and alleges as follows:

**NATURE OF ACTION**

1. This lawsuit challenges CMS's unlawful decision requiring AgeRight to provide Medicare Advantage ("MA") plan coverage to an individual (the "Subject Member") who was never eligible for that coverage under CMS's own regulations and guidance and who obtained enrollment by providing false information to AgeRight. CMS reached this decision despite the

plain text of the governing eligibility rules and substantial evidence demonstrating that the Subject Member did not meet the requirements for enrollment. CMS's erroneous decision has imposed on AgeRight more than $1 million in health care costs for someone who was never lawfully entitled to coverage. AgeRight brings this action to set aside and vacate CMS's unlawful decision.

2.　AgeRight is an Oregon-based company that offers Medicare Advantage products in certain service areas in Oregon that are specifically tailored to individuals living in long term care, assisted living, and memory care facilities. AgeRight offers a Chronic Condition Special Needs Plan ("C-SNP") (the "AgeRight C-SNP"), a Medicare Advantage plan for individuals with specific severe or disabling chronic conditions, such as heart failure and kidney disease.

3.　Federal law and its implementing guidance make permanent residence in the MA plan's service area a condition for eligibility, unless certain limited exceptions apply. *See* 42 U.S.C. §§ 1395w-21(a)(2), (b)(1)(A) (providing that, unless the Secretary otherwise provides, an individual is eligible to enroll in a MA plan "only if the plan serves the geographic area in which the individual resides."); 42 C.F.R. § 422.50(a)(3) (requiring an individual either to reside in the plan's service area or satisfy a limited CMS-approved out-of-area exception). This requirement ensures that an MA plan can provide quality and accessible network coverage for its members within the plan's service area and manage costs.

4.　In this case, the Subject Member obtained coverage in the AgeRight C-SNP by falsely representing to AgeRight that the Subject Member permanently resided within AgeRight's service area. AgeRight enrolled the Subject Member based on that false representation. After enrollment, AgeRight discovered that the Subject Member did not permanently reside within AgeRight's service area and promptly notified CMS. CMS initially agreed with AgeRight that AgeRight was required to cancel the Subject Member's enrollment. However, in complete disregard of the plain text of its own regulations and guidance, and without a basis in fact, CMS reversed course, imposing on AgeRight more than $1 million in health care expenses for an individual who was never eligible to enroll.

5.      To prevent AgeRight from suffering ongoing harm from CMS's unlawful decision, AgeRight respectfully requests that the Court enter an order vacating and setting aside that decision.

## PARTIES

6.      AgeRight is a corporation incorporated in Oregon, with its principal place of business in Milwaukie, Oregon.

7.      Defendant HHS is the executive department of the federal government headquartered in Washington, D.C. and is ultimately responsible for the federal Medicare and Medicaid programs.

8.      Defendant CMS is an administrative agency within HHS with the primary oversight responsibility for the Medicare program and the federal portion of the Medicaid program.

9.      Defendant Robert F. Kennedy, Jr. is named in his official capacity as Secretary of the United States Department of Health and Human Services.

10.      Defendant Mehmet Oz is named in his official capacity as Administrator of CMS. The CMS Administrator is responsible for the administration of the Medicare program, including an individual's eligibility to elect MA plans.

## JURISDICTION AND VENUE

11.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.

12.      Sovereign immunity is not an obstacle to this lawsuit.  *See* 5 U.S.C. § 702.

13.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action is brought against officers and agencies of the United States and at least one defendant resides in this District.

14.      The Complaint is timely under 28 U.S.C. § 2401(a) because it is filed within six years after AgeRight's right of action first accrued.

15.    AgeRight has exhausted all available administrative remedies.  On April 1, 2024, AgeRight submitted a written challenge to CMS's decision requiring AgeRight to provide coverage with CMS's Medicare Enrollment and Appeals Group.  In a letter dated August 5, 2024 (the "August 5 Letter", attached as Exhibit A), the Medicare Enrollment & Appeals Group advised AgeRight of its decision that the Subject Member was eligible for the AgeRight C-SNP and that AgeRight was required to provide the Subject Member with coverage, resulting in more than $1 million in costs imposed on AgeRight.  The August 5 Letter did not identify any further administrative appeal rights, although it offered AgeRight the opportunity to meet with CMS headquarters staff in the Medicare Enrollment and Appeals Group regarding this matter.  On or about September 19, 2024, AgeRight made a written request for that meeting.  That meeting took place remotely on October 1, 2024.  During that meeting, CMS advised AgeRight that its August 5 Letter was CMS's final decision on this matter and that there were no further administrative appeal rights, informal or otherwise, available to AgeRight.  AgeRight confirmed this understanding in a letter to CMS on October 15, 2024.  On June 16, 2026, after AgeRight made further inquiries asking whether CMS would reconsider its position, CMS indicated that it had considered the case internally and would not revise its decision as outlined in the August 5 Letter. No regulation permitted AgeRight to initiate an administrative hearing of CMS's directive requiring coverage for the Subject Member, and CMS repeatedly failed to identify any such process despite AgeRight's requests that CMS do so.

## **BACKGROUND**

### **The Medicare Program and Special Needs Plans**

16.    The Medicare program, authorized under Title XVIII of the Social Security Act, is a federal program that provides health insurance benefits for Americans aged 65 years and older and for certain disabled persons.  *See* 42 U.S.C. §§ 1395 *et seq*.

17.    Individuals enrolled in Medicare may elect to receive their benefits under Part C of the Medicare program, commonly referred to as the "Medicare Advantage Program."  *See* 42 C.F.R. §§ 422 *et seq*.  To execute the Medicare Advantage Program, CMS contracts with private

insurance payors, *i.e.*, MA plans, to provide and arrange for Medicare-covered benefits. *See* 42 C.F.R. § 422.4. In addition to arranging and paying Medicare-covered benefits of Medicare beneficiaries, MA plans typically provide supplemental benefits, as well as lower co-payments and other cost sharing, which further reduce the cost of covered services for beneficiaries.

18.    A Chronic Condition Special Needs Plan (C-SNP) is a type of Medicare Advantage plan for Medicare beneficiaries with specific severe and chronic diseases, such as heart failure or kidney disease. *See* 42 C.F.R. § 422.2. These plans include care coordination services and tailor their benefits, provider choices, and list of drugs they cover to best meet the specific needs of the groups they serve.

<strong>The Permanent Residency Requirement</strong>

19.    An essential eligibility requirement for an individual to enroll in an MA plan is satisfying the law's residency requirements. *See* 42 U.S.C. § 1395w-21(b)(1)(A); 42 C.F.R. § 422.50(a)(3). There are two ways to do so: (1) residing in the service area of the MA plan (*see* 42 C.F.R. § 422.50(a)(3)(i)); or (2) residing outside the service area of the MA plan, and (i) having been already enrolled in a health plan offered by the same company within one month of becoming eligible for Medicare Part A and Part B; (ii) the MA plan offers this option; and (iii) CMS agrees that the plan's network can adequately serve the individual plan (*see* 42 C.F.R. § 422.50(a)(3)(ii)).

20.    CMS has issued guidance that underscores the residency requirement. For example, CMS's Medicare Advantage and Part D Enrollment and Disenrollment Guidance (the "Medicare Advantage Guidance") titled, "Place of Permanent Residence," provides that "[a]n individual is eligible to enroll in an MA or Part D plan if they *permanently reside* in the plan's service area." Ex. B, Medicare Advantage Guidance, § 20.3 (emphasis added) (citing, *inter alia*, 42 C.F.R. § 422.50). Likewise, Medicare's Managed Care Manual (the "Medicare Manual") provides: "An individual is eligible to elect an MA plan if they permanently reside in the service area of the MA plan." Ex. C, Medicare Manual, § 20.2 (citing 42 C.F.R. §§ 422.2 and 422.50(a)(3)). Critically, both the Medicare Advantage Guidance and the Medicare Manual provide that a temporary move does not establish permanent residency. *See* Ex. B, Medicare

5

Advantage Guidance, § 20.3 ("Permanent residence is not. . . [a] temporary move into the plan's service area."); Ex. C, Medicare Manual, § 20.2 (citing 422.50(a)(3)) (providing that "a temporary move into the MA plan's service area does not enable the individual to elect the MA plan" and that in such circumstances "the MA organization must deny such an enrollment request.").

21.    There are four, limited exceptions to the permanent residency requirement ("Permanent Residency Exceptions"), which are available "for persons living outside the service area *at the time of the enrollment request*."  Ex. C, Medicare Manual, § 20 (emphasis added).  Two exceptions relate to individuals already enrolled in an MA plan.

a.    The first exception relates to existing MA plan enrollees who move out of the plan's service area.  When such existing enrollees "no longer reside in the service area of a plan and permanently move into the geographic area designated by the MA organization as a continuation area," the MA organization "may offer a continuation of enrollment option."  Ex. C, Medicare Manual, § 20.2.  Pursuant to 42 C.F.R. § 422.54, such enrollees "must reside in a continuation area on a permanent basis" and the "intent to no longer reside in an area and permanently live in another area is verified through documentation that establishes residency, such as a driver's license or voter registration card."

b.    The second exception relates to existing MA plan enrollees whose plan were terminated in their service area:  such enrollees "may remain enrolled in the MA plan while living outside the plan's new reduced service area" if certain conditions are met, including if "[t]here is no other MA plan serving the area at that time; [t]he MA organization offers this option; and [t]he member agrees to receive services through providers in the MA plan's service area."  Ex. C, Medicare Manual, § 20.2.

c.    The third and fourth exceptions to the residency requirement relate to individuals who are involved in conversions to Medicare Parts A and B, which are not at issue here.

22.    Ordinarily, an MA organization "must disenroll an individual from an MA plan it offers [if]…[t]he individual no longer resides in the MA plan's service area."  42 C.F.R. §  422.74

(b)(2)(i).  Temporary absences from the service plan area for less than six months, however, do not trigger disenrollment.   Ex. C, Medicare Manual, § 50.2.1.3; *see also* 42 C.F.R. § 422.74(d)(4)(ii).  Under this so-called "Six-Month Rule", if a member is temporarily absent from the service area, the MA organization "may not initiate disenrollment until six months have passed from the date the MA organization received information regarding the member's absence from the service area (or from the date the member states that their address changed, if that date is earlier)."  Ex. C, Medicare Manual, § 50.2.1.3.

23.    On their plain terms, neither the Permanent Residency Exceptions nor the Six-Month Rule cure an enrollment that was invalid from the outset, because each of those rules presuppose legally valid enrollments.  Instead, "an enrollment is not legally valid if it is later determined that the individual did not meet eligibility requirements at the time of enrollment."  Ex. C, Medicare Manual, § 40.6.  In such cases, "a retroactive cancellation of enrollment action may be necessary." *Id.*

24.    Further, if an enrollee "[k]nowingly provides, on the election form, fraudulent information that materially affects the individual's eligibility to enroll in the MA plan," an MA organization may disenroll that individual provided that the enrollee is provided notice and the MA organization reports the disenrollment to CMS.  42 C.F.R. § 422.74(d)(3)(i).

### The AgeRight C-SNP

25.    AgeRight operates Medicare Advantage Plans designed for beneficiaries in long-term care, assisted living, and memory care facilities, as well as other eligible individuals.  At the times relevant to this Complaint, CMS approved the AgeRight C-SNP in certain counties in Oregon, including Multnomah County.  However, AgeRight was not approved to offer its C-SNP in Umatilla County, nor was Umatilla County designated as a continuation area.

### The Subject Member's Permanent Residence in Umatilla County

26.    During the time periods relevant to this Complaint, the Subject Member permanently resided in Pendleton, Oregon, in Umatilla County, approximately 200 miles from Multnomah County.  The Subject Member and the Subject Member's spouse (the "Subject

7

Member's Spouse") owned a home in Pendleton and the Subject Member's primary care physician resides there.  On information and belief, prior to at least October 15, 2023, the Subject Member did not have any residence in Portland, no Portland-based primary care physician, and no other meaningful indicia of permanent residency in AgeRight's service area.

27.     In addition, the Subject Member was not eligible to enroll in the AgeRight C-SNP on the basis of the limited Permanent Residency Exceptions or the Six-Month Rule because:

a.     The Subject Member was not an existing AgeRight C-SNP enrollee who permanently moved into a continuation area designated by AgeRight;

b.     The Subject Member was not enrolled in a health plan offered by AgeRight and converting to Medicare Parts A and B;

c.     The Subject Member was not enrolled in an AgeRight C-SNP whose service area was terminated; and

d.     The Subject Member was not enrolled in the AgeRight C-SNP and temporarily moved outside of its service area for less than six months.

**The Subject Member Enrolls in the AgeRight C-SNP on the Basis of False Information**

28.     Prior to October 1, 2023, the Subject Member was enrolled in a Medicare plan offered by a company unrelated to AgeRight (the "Prior Medicare Plan").

29.     On or about September 27, 2023, the Subject Member was admitted to a hospital located in Portland, Oregon (the "Portland Hospital"), which is located within Multnomah County and within AgeRight's service area.

30.     On or about September 29, 2023, the Subject Member completed an online AgeRight C-SNP election form ("AgeRight Election Form").  Consistent with MA plan regulations and guidance, the AgeRight Election Form required the Subject Member to identify the Subject Member's "Permanent Residence Address."  In response, the Subject Member

identified an apartment building in Multnomah County, Oregon as the Subject Member's permanent address, but did not provide an apartment number.

31. On September 30, 2023, the Subject Member discharged himself from the Portland Hospital against medical advice "in order to be able to change his insurance which would allow him to undergo a transplant evaluation."

32. On or about September 30, 2023, AgeRight received the Subject Member's application to enroll in the AgeRight C-SNP.

33. On or about October 2, 2023, the Subject Member was readmitted to the Portland Hospital for cardiac surgery.

34. On or about October 2, 2023, an employee from the Portland Hospital left a message with AgeRight asking AgeRight to have the Subject Member's enrollment "processed as soon as possible" because there were some "life sustaining measures" to take with the Subject Member.

35. On or about October 6, 2023, based on the Subject Member's false representation on the AgeRight Election Form that the Subject Member's permanent residence was within the AgeRight C-SNP service area, AgeRight approved the Subject Member's election, and the Subject Member became a member of the AgeRight C-SNP.

**AgeRight Learns of the Subject Member's False Representations After Enrollment**

36. After the Subject Member enrolled in the AgeRight C-SNP, AgeRight learned that the Subject Member had falsely represented on the AgeRight Election Form that the Subject Member permanently resided in Multnomah County when, in fact, the Subject Member's actual permanent residence was in Umatilla County, Oregon.

37. Specifically, on or about October 6, 2023—after the Subject Member had been enrolled—AgeRight became aware that the Subject Member in fact resided in Pendleton, and accordingly, was not eligible for the C-SNP. Immediately after learning this information, an AgeRight representative called the Portland Hospital to inform them that the Subject Member did not reside in AgeRight's service area. In response, an employee of the Portland Hospital (the

"Portland Hospital Employee") told the AgeRight representative the following, among other things: the Subject Member needed to be on a C-SNP for the Subject Member's care at the Portland Hospital because the Subject Member's Prior Medicare Plan would not cover those services; that there were only two C-SNPS available in Portland (AgeRight and another plan) that would cover these services; and that the Portland Hospital did not work with the other plan.[1]

38.    On or about October 12, 2023, AgeRight received a copy of a social worker's chart notes for the Subject Member.  Among other things, those notes stated that the Subject Member "resides in a home in Pendleton."  The notes further provide that the Subject Member and the Subject Member's Spouse "have an apartment in Portland have signed a 1 year lease" and that they "will stay in Portland until they are able to return home post-transplant."  The notes further state that the Subject Member "does not reside locally to [the Portland Hospital] and plans to recover at an apartment they have rented."

39.    On or about October 19, 2023, and in compliance with Medicare's requirement that MA plan members be canceled from the MA plan "if it is later determined that the individual did not meet eligibility requirements at the time of enrollment," *see* Ex. C., Medicare Manual, § 40.6, AgeRight attempted to cancel the Subject Member's enrollment.  During a meeting with AgeRight's account representatives at CMS on or around October 26, 2023, AgeRight explained that it was canceling the Subject Member's enrollment because the Subject Member did not permanently reside in the AgeRight C-SNP service area.  The CMS account representatives agreed with AgeRight's decision.

40.    On or about October 28, 2023, CMS confirmed that the Subject Member had been retroactively cancelled from the AgeRight C-SNP.

---

[1]    Based on these admissions from the Portland Hospital Employee—which were made after the Subject Member had been enrolled—AgeRight came to believe that the Subject Member's discharged against medical advice so that AgeRight, and not the Prior Medicare Plan, would be responsible for paying for the Subject Member's health expenses.  *See* 42 C.F.R § 422.318(b)(1) (providing that if Medicare Advantage coverage begins during an inpatient hospitalization, the individuals' prior coverage is responsible for the Subject Member's medical expenses until discharge).

**CMS Insists On Reenrolling the Subject Member on the Basis of Inaccurate Information**

41.    On or about November 3, 2023, one of the same CMS representatives who had instructed AgeRight to cancel the Subject Member's enrollment contacted AgeRight.  The CMS representative stated that because the Subject Member had provided proof that that the Subject Member was leasing an apartment (the "Apartment") in Multnomah County, Oregon (i.e., within AgeRight C-SNP's service area), that AgeRight should re-enroll the Subject Member.

42.    However, the "proof" that the Subject Member provided to CMS—the first page of a 12-page lease—only reaffirmed that AgeRight's and CMS's prior decision to cancel the Subject Member's enrollment was correct and necessary under the enrollment rules.  Critically, the partial lease stated that the lease term *began* on October 15, 2023—more than two weeks after the Subject Member falsely claimed that the Subject Member currently resided in Multnomah County.  Moreover, the Subject Member did not provide the signature page or evidence that a deposit had been paid, or any other evidence that the lease had in fact been executed.

43.    On November 5, 2023, the Subject Member received a heart transplant, and on November 6, 2023, the Subject Member received a kidney transplant.

**AgeRight's Investigation Confirms That Subject Member Misrepresented the Subject Member's Permanent Address**

44.    On November 8, 2023, AgeRight, with counsel, and CMS representatives discussed the Subject Member's eligibility for membership in the AgeRight C-SNP.  AgeRight explained to the CMS representatives that the facts showed that the Subject Member had only recently entered into a lease agreement within AgeRight C-SNP's service area to give the false impression that the Subject Member permanently resided in the service area.  AgeRight also explained to the CMS representatives that the facts showed that the Subject Member's permanent residence was actually in Umatilla County Oregon, which is outside of AgeRight C-SNP's service area.  The CMS

11

representatives stated AgeRight should further investigate the Subject Member's permanent residence and update CMS as to the investigation.

45.     As part of its investigation into the Subject Member's actual permanent residence, AgeRight uncovered additional information confirming that the Subject Member did not permanently reside in the AgeRight C-SNP's service area.  For example, on or about November 12, 2023, AgeRight mailed the Subject Member correspondence requesting information. AgeRight sent the correspondence to the Portland address that the Subject Member had represented on the AgeRight Election Form was the Subject Member's permanent residence.  On or about November 17, 2023, the United States Postal Service returned the mail as "not deliverable as addressed."  The envelope also contained the notation "vacant."

46.     In response to questions or requests for information from AgeRight to determine the Subject Member's permanent residency, the Subject Member and/or the Subject Member's Spouse refused to provide basic information related to their residence.  For example, the Subject Member and/or the Subject Member's Spouse:

a.     Refused to provide a complete copy of the lease that purportedly established the Subject Member's permanent residency.

b.     Refused to provide a copy of the Subject Member's driver's license, claiming that the DMV would not update the license.

c.     Refused to provide AgeRight with any copies of utility bills within the AgeRight C-SNP service area.

d.     Refused to provide AgeRight proof of any taxes paid within the AgeRight C-SNP service area.

e.     Refused to admit or deny that the Subject Member continued to receive mail at the Pendleton home.

f.     Refused to provide AgeRight with a copy of the Subject Member's voter's registration, only to claim that the registration would be changed in the future;

12

47.     In addition to the Subject Member and the Subject Member's Spouse's failure to provide this requested information, AgeRight further learned through its investigation that the Subject Member did not have a primary care physician in the AgeRight C-SNP service area—but did have such a physician in Umatilla County.

48.     In December 2023, AgeRight, through counsel, provided the above information to CMS, which plainly established that the Subject Member did not permanently reside in the AgeRight C-SNP service area and, accordingly, that a retroactive cancellation was necessary to comply with CMS's regulations.

49.     In early 2024, despite the substantial facts showing that a retroactive cancellation was required, CMS notified AgeRight during a monthly call that CMS had determined that the Subject Member's enrollment was valid.

50.     On or about April 1, 2024, AgeRight, through counsel, again provided detailed written information to CMS showing why the Subject Member's permanent residence outside the AgeRight C-SNP service area rendered the Subject Member ineligible for membership in the AgeRight C-SNP and required cancellation.  In that communication, AgeRight's counsel also requested a meeting with CMS to confer regarding these issues.

51.     In May 2024, the Portland Hospital sent AgeRight a bill, demanding that AgeRight pay more than $1 million for health care that the Portland Hospital provided to the Subject Member.

52.     CMS responded to AgeRight's April 1 letter on August 5.  In its August 5 Letter, CMS rejected AgeRight's request to cancel the Subject Member's enrollment, concluding that the Subject Member was eligible for coverage at the time of enrollment, and thus requiring AgeRight to pay the Subject Member's health care expenses.  The August 5 Letter provided several reasons in support of CMS's decision, all of which are contrary to law and disregard the evidentiary record.

        a.     **CMS ignored its guidance that temporary moves do not establish permanent residency.**  The question before CMS was whether the Subject Member permanently resided in AgeRight's service area at the time of enrollment.  CMS instead treated evidence of a

13

later, treatment-related move in Portland as sufficient to establish permanent residence, ignoring its own guidance that a temporary move into an MA plan's service area does not establish permanent residence and enrollment eligibility.

b. **CMS improperly relied on the absence of a specific minimum time period for establishing residence.** The regulations and guidance do not provide that permanent residence must be established by a specific number of days—and AgeRight never made that argument. But the absence of any minimum-duration rule does not eliminate the requirement that the Subject Member permanently reside in the plan's service area. The evidence AgeRight presented to CMS proved that the Subject Member did not permanently reside in Portland, but only temporarily moved there for treatment.

c. **CMS unreasonably treated the Subject Member's alleged 12-month Portland lease as evidence of permanent residence.** The lease did not begin until October 15, 2023—after the Subject Member represented that the Subject Member already permanently resided in Multnomah County, after the October 1 effective date of coverage, and after AgeRight accepted the enrollment based on the Subject Member's false representation. CMS failed to explain how a later lease could establish permanent residence at the time of enrollment.

d. **CMS ignored substantial contrary evidence.** CMS credited the Subject Member's and the Subject Member's Spouse's self-serving statements while failing to address contemporaneous records indicating that the Subject Member resided in Pendleton, did not reside locally to the Portland Hospital, and planned to stay in Portland only until the Subject Member could return home after treatment. CMS also failed to meaningfully address the Subject Member's refusal to provide ordinary proof of permanent residence in Portland, the returned mail marked "vacant," and the absence of Portland-based indicia of permanent residency.

e. **CMS improperly faulted AgeRight for accepting the enrollment before discovering the false residence information.** AgeRight accepted the enrollment because the Subject Member represented on the AgeRight Election Form that the Subject Member's permanent residence was within AgeRight's service area. Moreover, the Portland Hospital requested

14

expedited enrollment in order to provide life-sustaining care to the Subject Member. Once AgeRight learned that the representation was false, AgeRight promptly investigated, notified CMS, and sought cancellation. CMS's reasoning would improperly penalize an MA organization for relying on an enrollee's false eligibility information even though CMS's own guidance recognizes that an enrollment later found to be ineligible at inception is not legally valid.[2]

f.      **CMS misapplied the Six-Month Rule.** CMS also erred in relying on the Six-Month Rule as support for its conclusion that the Subject Member's enrollment was legally valid. CMS reasoned that the Subject Member intended to move to Portland for at least 12 months on the basis of the partial lease, and that the partial lease "indicates that [the Subject Member] did not reside in any Pendleton service area for purposes of MA enrollment." Ex. A, Aug. 5 Letter, at 4. CMS further reasoned that, because the partial lease indicated that the Subject Member did not reside in Pendleton, the Subject Member was not eligible for MA coverage in Pendleton. *Id.* Citing the Six-Month Rule, CMS then argued that living in Portland for more than six months would mean that the Subject Member would be ineligible for any MA plan that did not cover Portland and therefore, the Subject Member would be ineligible for any MA plan unless it covered both Pendleton and Portland. *Id.* Putting aside its faulty factual premises,[3] CMS's reasoning that AgeRight's position would render the Subject Member ineligible for any coverage is clearly erroneous. The Subject Member remained eligible for Medicare coverage in Pendleton, where the

---

[2]      CMS's suggestion that AgeRight's position raised health-status discrimination concerns was unsupported. AgeRight did not seek cancellation because of the Subject Member's medical condition, transplant status, expected costs, or need for care. AgeRight sought cancellation because the Subject Member did not satisfy the service-area residency requirement and obtained enrollment by providing false information. CMS's rank speculation ignored the record showing that AgeRight raised the residency issue promptly after learning the Subject Member did not permanently reside in the service area.

[3]      For the reasons stated above, the inferences that CMS draws from the Subject Member submitting one page of a 12-page lease are irrational. That one page stated that the lease was to begin after the Subject Member enrolled in the AgeRight C-SNP, and the Subject Member refused to provide evidence that it was signed. If anything, that one page only establishes an intent for the Subject Member to temporarily move to Portland to receive treatment, which does not satisfy CMS's residency requirement. The first page of the lease, moreover, does not establish that the Subject Member no longer resided in Pendleton, where, on information and belief, the Subject Member continued to own a home and pay a mortgage.

Subject Member permanently resided.  CMS's reasoning also conflates the rules regarding initial eligibility, which require permanent residence the MA plan's service area at the time of enrollment, and the Six-Month Rule, which governs temporary absences of a validly enrolled MA member— and which has no relevance to this case.

53.    While the Subject Member is no longer enrolled in the AgeRight C-SNP, AgeRight continues to suffer harm from CMS's arbitrary, capricious, and unlawful decision to require AgeRight to provide coverage for an individual who was never eligible.  Absent a ruling from this Court that CMS's decision was unlawful, AgeRight will be unable to recoup the substantial funds it was required to pay for the Subject Member's health care expenses, in violation of federal law and regulations.

## FIRST CAUSE OF ACTION

### (Violation of the Administrative Procedure Act)

54.    AgeRight incorporates the allegations of paragraphs 1 through 53 of the Complaint as though fully set forth herein.

55.    The Administrative Procedure Act provides that a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

56.    CMS's decision articulated in its August 5 Letter, as approved and directed by Defendants, concluding that the Subject Member was eligible for coverage at the time of enrollment, prohibiting AgeRight from canceling the Subject Member's enrollment, and requiring AgeRight to pay for the Subject Member's health care expenses, is a final agency action made reviewable by 5 U.S.C. § 704.

57.    Defendants' decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).  Defendants failed to engage in reasoned decision-making, disregarded the plain text of their own regulations and guidance requiring permanent residence in the MA plan's service area as a condition of eligibility, and failed to provide an adequate explanation for their decision.

16

58.     In particular, CMS disregarded substantial evidence that the Subject Member did not permanently reside in AgeRight's service area, including contemporaneous records establishing that the Subject Member resided in Pendleton, the Subject Member's refusal to provide ordinary indicia of permanent residence in Portland, mail returned as undeliverable and marked "vacant," and the absence of a Portland-based primary care physician.  CMS instead credited the Subject Member's self-serving statements and a single page of an unsigned 12-page lease that, by its own terms, did not begin until after the Subject Member had already enrolled.

59.     Defendants' decision is also in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C).

60.     The Medicare Act provides that an individual is eligible to elect an MA plan "only if the plan serves the geographic area in which the individual resides."  42 U.S.C. § 1395w-21(b)(1)(A).  The implementing regulations likewise require that an individual reside in the plan's service area to be eligible for enrollment, absent limited exceptions.  42 C.F.R. § 422.50(a)(3).

61.     By directing AgeRight to maintain the Subject Member's enrollment and to pay for the Subject Member's health care expenses despite the Subject Member's failure to satisfy this statutory residency requirement, Defendants exceeded the limitations Congress placed on MA plan eligibility.

62.     AgeRight has suffered and will continue to suffer harm as a result of Defendants' unlawful actions, including more than $1 million in healthcare expenses CMS imposed on AgeRight for the Subject Member.

63.     AgeRight is entitled to an order vacating CMS' decision that the Subject Member was eligible for coverage at the time of enrollment, prohibiting AgeRight from canceling the Subject Member's enrollment, and requiring AgeRight to provide coverage for the Subject Member's health care expenses, as well as all other relief as set forth in its Prayer for Relief.  *See* 5 U.S.C. § 706.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff AgeRight prays for the following relief:

17

A. Declare that the Defendants' decision that the Subject Member was eligible for coverage in the AgeRight C-SNP, prohibiting AgeRight from canceling the Subject Member's enrollment, and requiring AgeRight to provide coverage for the Subject Member's health care expenses, is arbitrary, capricious, and not in accordance with law in violation of 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitation in violation of § 706(2)(C).

B. Vacate and set aside Defendants' decision.

C. Remand this matter to CMS for further proceedings consistent with the Court's decision.

D. Grant such other further relief as this Court deems just and proper.

DATED: July 31, 2026                                 Respectfully submitted,

_____
**BALLARD SPAHR, LLP**
John F. Hundley, D.C. Bar No. 44915
Hundleyj@ballardspahr.com
1909 K Street, N.W., 12th Floor
Washington, DC  20006
Telephone: (202) 661-2212
Facsimile: (202) 661-2299

Rushmi Bhaskaran (*pro hac vice* forthcoming)
bhaskaranr@ballardspahr.com
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 223-0200
Facsimile: (212) 223-1942

Mohammed N. Workicho (*pro hac vice* forthcoming)
workichom@ballardspahr.com
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone: (503) 778-2100
Facsimile: (503) 778-2200

*Attorneys for Marquis Advantage, Inc., d/b/a*
*AgeRight Advantage Health Plan*

18